HARRY BAUMAN, Respondent, Appellant, *v.* NORFOLK AND WESTERN RAILWAY COMPANY, Appellant, Respondent.

First Department, May 2, 1919.

**Railroad — negligence — duty of railroad company to exercise vigilance within its switch yard — action by soldier for injury within said yard by being struck by car which had been kicked by switch engine — when statement by court that " defendant has no defense " deprives said defendant of a fair trial.**

Ordinarily a railroad company within its switch yard is not held to the same duty of vigilance as upon a public crossing.

Where in an action by a soldier detailed by the government to watch a bridge which was situated in defendant's switch yard to recover for personal injuries sustained by being struck by a car which had been kicked by a switch engine, as he was returning during the evening to his tent which had been placed by the side of the track within the defendant's yard by its consent, the court during the trial stated that " there is not any defense," and in the course of his charge to the jury in attempting to explain said statement and distinguish between a defense and a denial, reiterated the statement many times that " the defendant has no defense," a new trial should be granted.

LAUGHLIN and SHEARN, JJ., dissented.

APPEAL by the defendant, Norfolk and Western Railway Company, from so much of an order of the Supreme Court, made at the New York Trial Term and entered in the office of the clerk of the county of New York on the 12th day of March, 1918, as denies upon certain conditions defendant's motion to set aside the verdict and for a new trial, and also from an order entered in said clerk's office on the 21st day of March, 1918, extending the time within which plaintiff may stipulate to reduce the verdict herein from $75,000 to $35,000 and so obviate a new trial.

Appeal by the plaintiff, Harry Bauman, from the order granting defendant's motion for a new trial herein upon certain conditions.

*John C. Robinson* of counsel [*Theodore H. Lord* and *Bernard Breitbart* with him on the brief; *Breitbart & Breitbart*, attorneys], for the plaintiff.

*Frederick J. Moses* of counsel [*Stanley M. Moffat* and *Theodore W. Reath* with him on the brief; *Masten &. Nichols*, attorneys], for the defendant.

SMITH, J.:

This action is an important one, both to the plaintiff and to the defendant. The plaintiff has lost both legs. His injuries are serious and if the defendant is responsible for those injuries, the plaintiff is entitled to a substantial verdict. The verdict, even as reduced, is a large verdict, and the defendant is entitled to insist that a verdict of this size shall only stand upon a fair presentation to the jury of all the issues upon which its liability may depend.

The plaintiff was one of seven guardsmen who were detailed by the government to watch a bridge which was situated in the defendant's yard near Lynchburg, Va. By consent of the railroad company their tent was placed by the side of the track within the defendant's switch yard near to the bridge in question. This tent was about a mile from the city of Lynchburg and on the night in question this plaintiff had been attending an entertainment in the city of Lynchburg and about half-past ten o'clock at night was coming back to his tent. He walked through the yard between the tracks of the defendant until he came about opposite to his tent, at which place he started across the tracks in order to reach his tent. While passing one of the switch tracks a car which in the process of shifting had been kicked by the switch engine, ran over him and caused the injuries for which he has here recovered.

Ordinarily a railroad company within its switch yard is not held to the same duty of vigilance as upon a public crossing. Any other rule would be impracticable. A train of cars is taken into the switch yards and the different cars have to be distributed to the different switches upon which the cars are gathered for further transportation to points upon other roads or to different points upon the road of the company itself. The employees of the railroad company working in these switch yards, knowing their custom, are charged with knowledge of these facts and must be and are required to be upon constant watch that in crossing the switch tracks they may not be run down by these cars which are being switched to the different tracks. With this practice known to all of the employees, it is unnecessary and impracticable that warning by bell or whistle shall be given as each

car is switched from one track to another, and such warning
is not expected by the employees thus using the tracks.    The
plaintiff, together with the other guardsmen, had been on
duty by the side of this switch yard for two months and
presumably had general knowledge of the custom of the rail-
road company in thus shifting its cars and of the fact that
warnings were not given, to protect those whose work compel
them to cross the tracks.    Within a very short distance from
this tent and from this place where the plaintiff crossed the
tracks when he was injured, was a single-track bridge across
the James river upon which bridge there was no footpath.
The bridge was intended, in the main, for the transportation
of trains only and not for general use by the public.    Just
north of this switch yard was a regular roadway and bridge
across the James river which could be used by the public in
passing from a point beyond the James river into Lynchburg.
There were no houses east of the point in question before
reaching the bridge.    On the other side of the bridge were
some fertilizer works and a mill and a few huts.    Notwith-
standing this was a private switch yard it had been the
custom of the laborers at work on the other side of the bridge
in going to and from their work to a certain extent to cross
this bridge and walk to the city of Lynchburg through this
yard.    The greater part of the travel of the public in thus
using the yard was in the morning when the workmen were
going to their work upon the other side of the river and in
the evening when they returned.    There was evidence, also,
to the effect that at night these yards were thus used to a
certain extent.    In passing through the yard it may fairly
be inferred that most of the persons so passing went upon
the north side of the tracks just beyond where the tent was
located and then crossed over some of the tracks until they
came to a space that was fairly wide, between a couple of the
tracks upon the south side of the yard, upon which space
they proceeded for substantially the balance of the route
to Lynchburg.    This crossover, as I will call it, was simply
a place used as such and was also used by persons returning
from Lynchburg when they had occasion to pass through the
yards and over the bridge.    While, as before stated, this
crossover was used to an extent in the day time, and by

workmen returning from their work, the evidence fails to show that there was any substantial use of this crossover as late as half after ten at night, the time when this accident occurred. It is probable that those guardsmen occasionally attended entertainments in Lynchburg and came home at night through the yard and over this crossover. But the duty of the defendant in protecting this crossover as against these cars switched form one track to another, depends entirely upon the extent to which this crossover was used at the time that the defendant is claimed to have been negligent. With the acquaintance which these guardsmen, after a two months' stay at this hut are presumed to have had of the custom of this railroad, it is, at least, doubtful whether at that time of night the defendant was called upon to exercise any special diligence in protecting them in using this crossover.

Furthermore, the court charged the jury that the defendant was not negligent in failing to put a light upon this car and was not obliged to have a man upon the car to give any warning. It seems that there were several arc lights through the yard and one arc light very near to this crossover which would throw light upon the crossover. There is evidence to the effect that that light was out upon the night in question, but the court charged the jury that negligence could not be predicated upon that fact. The court charged the jury that they had no right to say that a light should be upon the car, because that would be running the road, and further charged: " And the law does not allow you to determine what they should have done, but only to determine whether having done things as they did do them, they were careless." By this charge, without naming any specific duty which the defendant owed to the plaintiff, the jury was authorized to find that liability could be predicated upon any act which the jury in their judgment should deem to be a careless act. Under this charge the jury could have found that the defendant was careless in not having electric bells upon its cars which were continually rung while the car was moving or were negligent in not having a flagman at this crossover. They were given no rule whatever to guide them in determining what was defendant's legal duty, the violation of which could be made the basis of liability, with the result that they were left free

to charge the defendant with liability for any act of commission or omission which the jury might deem negligent, notwithstanding they adopted a course generally adopted by railroads in the use of their switch yards. While no exception was taken to this part of the charge, nevertheless, the indefiniteness of the charge, together with the slight evidence of the use of the yard at that time of night, sufficient to impose upon the defendant a positive duty to give signals that would not ordinarily be given in a switch yard, leads us to look at the case more critically to determine whether any part of the charge of the court was prejudicial to the defendant, to such an extent as to make doubtful whether the defendant had a fair trial, and whether the case was so presented to the jury as to give them a clear conception of the questions upon which the defendant's liability should properly be based.

In the course of the trial upon ruling upon the admission of evidence, the court made the remark: " *There isn't any defense.*" In the course of the charge this remark was referred to by the trial judge as follows: " Another thing. In the course of the trial, I made an observation, when Mr. Robinson was speaking to you, and referred to the defendant's defense. I said to him, ' The defendant has no defense.' I wish to explain that Mr. Moses fears that you may have been misled into a misapprehension due to my saying that. My saying that was entirely correct, though it might mislead you. *The defendant has no defense.* It is not necessary that the defendant should have a defense. *The defendant has a denial. That is not a defense.* The plaintiff alleges that the defendant was negligent, and that he was not, and that the defendant puts in issue, *denies that it was negligent, but that is not a defense.* If the defendant, for instance, admitted that it was negligent, and then set up some matter in defense, with respect to its liability, by saying, for instance,— well, no, it would not even then be a defense to say that he jumped into the danger himself, for that would really be a denial of the lack of contributory negligence though the defendant might have set up as a defense, that he himself jumped into the danger voluntarily, desirous of doing it. That would be a defense, because it would then be conceding all that he said, and

setting up some new matter, to show that even though things were as he said, nevertheless it was not responsible. This defendant does not put up any such claim as that; *claims no defense;* if it did, it would have the need of proving its defense, while the defendant has the need of proving nothing here, *for the defendant does not claim anything.*

" If a man puts in a defense, and claims that he has a defense, he has to prove his defense, *but the defendant here puts in no defense,* and it does not need to prove any defense, *for it has not any defense.* The plaintiff is the one who makes the claim. He claims he has a good cause of action, and that the defendant should pay, and all that the defendant does is to deny that.

" That is what I meant when I said the defendant has no defense. So I hope you gentlemen are all clear about it, *for the defendant has no defense.* It simply denies the plaintiff's claim that it was negligent, and also denies, in substance, and puts it in issue, that he was free from negligence, so that it puts upon the plaintiff, the burden of proving that he was free from negligence, and that the defendant was guilty of negligence. Through this denial it puts upon him the necessity of proving his case. That is all. *But the defendant asserts no defense, and has no defense to prove.* In fact, *has nothing to prove, for it claims nothing.* Have I cleared it up, Mr. Moses? Mr. Moses: I do not think so, your Honor. The Court: I thought I made myself clear about it. Mr. Moses: I ask your Honor to instruct the jury that in saying that the defendant had no defense, what you meant was that we had set up no affirmative allegation of new facts as a defense. The Court: Yes, I meant that, and I meant just what I said. It is true what I said. *The defendant has no defense.* It is not necessary that it should have. When a man denies what another man asserts, that is not a defense. That is a denial. Suppose, for instance, A sues B for assaulting him. B denied that he did the assaulting. That would not be a defense. It would be a denial. But, suppose B admitted that he assaulted A, and said, ' I admit I assaulted you, but I did it in self-defense.' That would be a defense, because it would be admitting that he assaulted A, but it would be defending his assault upon the ground that it was rightful, in

view of the fact that it was in self-defense. That is what I meant by a defense. The defendant admits nothing that the plaintiff claims, hence it does not need any defense. *It has not set up any.* Mr. Moses calls it an affirmative defense. Call it any kind of defense you like. *It sets up none, does not claim any, and has not any to prove,* but it does set up a denial of the plaintiff's claim, and that makes it so that the plaintiff has all to prove. I hope it is clear now. If it is not, I will try to make it clear."

It is clear to the trained legal mind what the trial court meant to charge. I am not at all sure, however, that it was made clear to the minds of the jury. In Bouvier's Law Dictionary [Rawle's Rev.] the word " defense " is defined in pleading and practice as " The denial of the truth or validity of the complaint. A general assertion that the plaintiff has no ground of action, which is afterwards extended and maintained in the plea." In 13 Cyc. 762, " Defense " is defined: " In its legal sense, the term [defense] signifies not a justification, protection or guard which is now its popular signification, but merely an opposing or denial of the truth or validity of the complaint." In Webster's Dictionary it is said: " To defend is (in law) to deny the right of the plaintiff in regard to the suit."

In the popular acceptation of the term the word " defense " includes both a denial and an affirmative defense. While the trial judge charged the jury that the plaintiff must prove his case and that a defense was not a denial, nevertheless, it reiterated time and again the expression " the defendant has no defense." I can conceive of nothing which could be said by the trial court which would be more damaging to a defendant than such a charge. To say that the plaintiff must prove his case, but, nevertheless, that the defendant has no defense, is well nigh equivalent to the direction of a verdict. The learned trial justice pointed out that he meant to distinguish between a defense and a denial, and, as before stated, if the jury had been composed of trained lawyers, the defendant might not have been harmed by the charge as made, nevertheless, when made to jurors untrained in legal technicalities, the impression created by the reiteration of this statement could not have been harmless and the defendant could not have obtained under that charge a fair consideration of

the issues presented to the jury as determining its liability for this accident. For the reason, therefore, that the defendant did not have a fair trial of the issues upon which its liability depends, I am of the opinion that the order granting a new trial so far as appealed from by the defendant should be reversed and a new trial granted, with costs to appellant to abide the event.

With this conclusion it becomes unnecessary to consider the plaintiff's appeal which should, therefore, be dismissed, without costs. Nor is it necessary to consider the defendant's appeal from the order extending plaintiff's time to stipulate to reduce the verdict until after the decision of this court upon the appeal herein, which appeal is also dismissed.

CLARKE, P. J., and MERRELL, J., concurred; LAUGHLIN and SHEARN, JJ., dissented from reversal, and on defendant's appeal voted to modify by granting a new trial unless plaintiff stipulates to reduce the recovery to $50,000.

Order of March 12, 1918, so far as appealed from by defendant reversed and new trial ordered, with costs to defendant to abide event; appeal of plaintiff from said order dismissed; appeal of defendant from order of March 21, 1918, dismissed.